**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 15-CV-61902 - BLOOM**

JEFFREY EMIL GROOVER,
individually and on behalf of all
others similarly situated,

       Plaintiff,

v.

U.S. CORRECTIONS, LLC;
PRISONER TRANSPORTATION
SERVICES, LLC; and JOHN DOES
1-100,

       Defendants.

_____/

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23**

Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Jeffrey Emil Groover respectfully moves for class certification and for appointment of Plaintiff as class representative and Hedin Hall LLP as class counsel.

## I.    INTRODUCTION

Rule 23 exists for cases like this.  Cases brought to vindicate fundamental civil rights.[1]  To redress systemic cruel and unusual punishment.  To put a stop to profiteers hauling human beings in excessively hot, pitch-black "dog cages" lacking sufficient water, working ventilation or any other semblance of basic human dignity for days on end.  Each member of Plaintiff's proposed class asserts civil rights claims arising from these same deplorable conditions of confinement against the same private, for-profit prisoner extradition companies. Nearly every legal and factual issue presented is readily susceptible to class-wide resolution. Plaintiff has displayed exemplary initiative and involvement.  His counsel's experience is extensive.  A case better suited for class treatment is difficult to imagine.

Plaintiff seeks certification of the following class of persons pursuant to Rules 23(a), (b)(2), (b)(3), and (g):

> All persons in the United States who, between October 12, 2012 and the date of the Court's order granting class certification, were transported as a pretrial detainee by Prisoner Transportation Services, LLC or any of its affiliates or subsidiaries, including U.S. Corrections, LLC, in a "dog-cage"-equipped van for twenty-four (24) or more hours, through at least one location with an outdoor temperature of at least 80 degrees Farenheit, as measured by a judicially-noticeable source.[2] (hereinafter, the "Proposed Class").

The Proposed Class satisfies all the requirements of Rule 23 and should be certified on both a damages and injunctive relief basis pursuant to Rules 23(b)(2) and 23(b)(3).

## II.    FACTUAL BACKGROUND

This putative class action lawsuit arises out of systemic civil rights violations committed by the for-profit prisoner extradition companies Prisoner Transportation Services, LLC ("Prisoner Transportation") and U.S. Corrections, LLC ("U.S. Corrections").

---

[1]    "If there was [a] single, undoubted goal of [Rule 23], the energizing force which motivated the whole rule, it was the firm determination to create a class action system which could deal with civil rights." John P. Frank, Response to 1996 Circulation of Proposed Rule 23 on Class Actions, *in* 2 WORKING PAPERS OF THE ADVISORY COMM. ON CIVIL RULES ON PROPOSED AMENDMENTS TO CIVIL RULE 23 260, 266 (Rules Committee Support Office, 1997).

[2]    Excluded from the Class are: (1) any Judge presiding over this action and members of her or her family; (2) any Defendant's subsidiaries, parents, successors, predecessors, and any entity in which any Defendant or its parent has a controlling interest (as well as current or former employees, officers and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and counsel for any Defendant; and (6) the legal representatives, successors, and assigns of any such excluded persons.

Between August 14, 2015 and August 17, 2015, U.S. Corrections transported Plaintiff from Butner, North Carolina to Fort Lauderdale, Florida pursuant to a warrant issued by the Broward County Sheriff's Office.[3] Throughout the 52-hour trip, Plaintiff was confined to a small steel cage (called the "dog cage" by defendants) and forced to sit on a metal bench in a pitch black, windowless van.  As the van zig-zagged through nearly every state south of the Mason-Dixon line, Defendants were intentionally depriving Plaintiff of adequate ventilation, water, and air conditioning, despite the excruciatingly hot conditions both outside (in excess of 80 degrees) and inside the van (well in excess of 90 degrees).  As a result of the conditions of his confinement, Plaintiff experienced physical, mental, and emotional exhaustion from the trip, as well as heat stroke, vomiting, extreme heat exposure, heat-induced delusions, and sleep deprivation.

On April 4, 2017, the United States Court of Appeals held that these conditions, as alleged by Mr. Groover, constituted cruel and unusual punishment in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.  *Groover v. U.S. Corrections, et al.*, No. 15-14813, Apr. 4, 2017, Op. at 9 (11th Cir.) ("Applying common knowledge about how quickly and how high the temperature can rise in the summer inside a vehicle without adequate cooling or ventilation and taking his allegations as true, we conclude that Groover was exposed to an extreme condition in violation of his constitutional rights.").

Such unconstitutional conditions of confinement are endemic to the for-profit prisoner extradition industry generally.[4]  But nowhere are such conditions more pervasive than they are in the fleet of vans operated

---

[3]     Because Plaintiff was transported by U.S. Corrections in August 2015 at the behest of the Broward County Sheriff's Office, on a warrant to stand trial in Fort Lauderdale, Florida, Plaintiff was transported by U.S. Corrections in August 2015 in his capacity as a pre-trial detainee.  *See, e.g., Brothers v. Klevenhagen*, 28 F.3d 452, (5th Cir. 1994) (holding plaintiff was a "pretrial detainee" while being transported from custody in one jail to custody in different county jail); *Dannebaum v. County of San Diego*, 2016 WL 2931114, (S.D. Cal. 2016) (holding parolee alleging Section 1983 claims was "pretrial detainee" while in custody awaiting trial on new charges because that "incarceration had less to do with his prior conviction or his status as a parolee, and more to do with the new separate crime for which he was being held . . . [and] for which he hadn't been convicted").

[4]     *See, e.g.,* Eli Hager and Alysia Santo, *Private Prisoner Vans' Long Road of Neglect*, The New York Times, July 6, 2016, *available at* https://www.nytimes.com/2016/07/07/us/prisoner-transport-vans.html (last accessed June 16, 2018) (revealing "a pattern of prisoner abuse and neglect in an industry that operates with almost no oversight," and describing practices of locking detainees in vans for days on end with minimum access to food and water); Eli Hager, *Death on a Prison Bus: Extradition Companies' Safety Improvements Lag*, The New York Times, March 23, 2017, *available at* https://www.nytimes.com/2017/03/23/us/prisoner-transport-vans.html (last accessed June 17, 2018) ("Vans or buses travel long, circuitous routes, sometimes for weeks, with little sleep for guards or prisoners. Because they cross so many jurisdictions, oversight falls into a gray zone."); U.S. Senator Corey A. Booker, Letter to U.S. Attorney General Loretta Lynch, July 12, 2016, *available at* https://www.scribd.com/document/318107131/Lynch-Prison-Van-Abuse-Letter-7-12-2016 (last accessed June 15, 2018) (writing to "urge the Department of Justice to fully investigate the nature and extent of prisoner abuse and neglect within the private prisoner transport industry," and to "hold

by U.S. Corrections and Prisoner Transportation Services, as experienced by Plaintiff and every other member of the Proposed Class.[5]   By way of illustration, in July 2012, a pretrial detainee being transported from Florida to Ohio named Steven Galack died in a van operated by Prisoner Transportation Services, under the following despicable conditions:

> Galack was loaded into a van run by Prisoner Transportation Services of America, the nation's largest for-profit extradition company.  Crammed around him were 10 other people, both men and women, all handcuffed and shackled at the waist and ankles. They sat tightly packed on seats inside a cage, with no way to lie down to sleep. The air conditioning faltered amid 90-degree heat. Galack soon grew delusional, keeping everyone awake with a barrage of chatter and odd behavior.
> . . .
> The guards said later in depositions that they had first noticed Galack's slumped, bloodied body more than 70 miles later, in Tennessee. A homicide investigation lasted less than a day, and the van continued on its journey. The cause of death was later found to be undetermined.
>
> Robert Downs, the chief operating officer of PTS, declined to comment on the deaths. He said guards were instructed to contact local officials when a serious medical emergency arises. "Unless it's life or death, we can't open the cage on the vehicle," Downs said.

Fernando Colon, *The Horrible Things I Saw Driving a Van Packed With Prisoners: Dehydrated, hungry prisoners defacating on themselves*, The Marshall Project, July 7, 2016, *available at* https://www.themarshallproject.org/2016/07/07/the-horrible-things-i-saw-driving-a-van-packed-with-prisoners (last accessed June 12, 2018).

Discovery in this litigation has revealed that the conditions of confinement described above are the product of the same policies, practices and procedures set forth in the same written manual of guidelines provided by Defendants, including U.S. Corrections, to all extradition officers.  *See* Transcript of Deposition of John A. Stirling, June 12, 2018 ("Stirling Depo. Tr.")[6], at 73:5-25; *id.* Ex. 6 ("Prisoner Transportation Manual" of U.S. Corrections, LLC).  John A. Stirling, a former employee of U.S. Corrections and one of the two officers who transported

---

executes of for-profit prisoner transport companies accountable for their involvement in any violations of federal civil or criminal laws").

[5]   *See* Fernando Colon, *The Horrible Things I Saw Driving a Van Packed With Prisoners: Dehydrated, hungry prisoners defacating on themselves*, The Marshall Project, July 7, 2016, *available at* https://www.themarshallproject.org/2016/07/07/the-horrible-things-i-saw-driving-a-van-packed-with-prisoners (last accessed June 12, 2018) (former U.S. Corrections employee recounting that "[m]y prisoners got sick and threw up on each other all the time. They passed out from heat stroke — the windows barely opened, for security reasons, and the air conditioning was always broken. It got so hot that they would strip down to their underwear[.]"); Eli Hager, *Inside the Deadly World of Private Prisoner Transport*, The Marshall Project, July 6, 2016, *available at* https://www.themarshallproject.org/2016/07/06/inside-the-deadly-world-of-private-prisoner-transport (last accessed June 12, 2018) (stating that drivers employed by Prisoner Transportation Services and U.S. Corrections "travel up to weeks at a time along circuitous routes, typically picking up and dropping off prisoners in 15-passenger vans or sometimes minivans retrofitted with interior caging and darkened windows").

[6]   A true and correct copy of the transcript of Mr. Stirling's June 12, 2018 deposition (and all exhibits thereto) is attached as Exhibit "A" to the Declaration of Frank S. Hedin ("Hedin Decl."), filed concurrently herewith.

Plaintiff in August 2015, testified at deposition that the Prisoner Transportation Manual, provided to all employees of the company, *see id.* 73:8-22, establishes "the policies, practices, and procedures of USC," *id.* at 73:23-25.

As a threshold matter, the Prisoner Transportation Manual generally prohibits a driver from stopping anywhere except at "secure facilities" in pre-determined locations, which are few and far between.  *Id.* at 76:22-77:3 ("Q: So the policy of USC is that breaks are only to be conducted in secure facilities every four hours; correct? A: Correct. Q: So it's the policy of USC not to make any stops except for the scheduled breaks at secure facilities every four hours; correct? A: Correct. And to get gas."); *id.* at 87:18-88:4 ("Q: And when you say 'secure location to stop at,' what do you mean by that? A: It would have to be a sally port or some kind of jail or DOC facility. Q: Okay. And how prevalent are such facilities on the road when you're traveling on these routes? Generally speaking, how long does it take . . . to get [to] one of those locations from another location?  A: It depends on the area of the U.S. There was one time when I was in New York where it took me almost an entire day to get my inmates seen between Massachusetts and New York and surrounding states because every jail in the area told me no.").[7]

Plaintiff, like all members of the Proposed Class, was subjected to Defendants' uniform policy against stopping, including at a time when Plaintiff was in need of medical assistance to remedy symptoms caused by the excruciatingly hot conditions in the van.  *See* Transcript of Deposition of Jeffrey Emil Groover, May 18, 2018 ("Groover Depo. Tr.")[8], at 90:17-90:23 ("Q: Did you ever ask the guards or any medical attention at any point during the transport? A: I believe I did after -- after I was sick and -- and he said something to the effect that it's not company policy to stop."); *id.* at 152:12-152:18 (Q: Okay. Did any of the guards at any time try to prevent you from sleeping? A: Well, they wouldn't stop. We asked them, please stop, to let us get some -- a few hours of sleep, you know, rest.  And they said, it's not company policy. We're not stopping.").)

This uniformly-applied policy against stopping prohibits drivers from helping detainees seek refuge from extreme heat.  Indeed, the policy against stoppage is so strictly enforced that it effectively swallows the single

---

[7]     *See also, e.g., See* Fernando Colon, *The Horrible Things I Saw Driving a Van Packed With Prisoners: Dehydrated, hungry prisoners defacating on themselves,* The Marshall Project, July 7, 2016, *available at* https://www.themarshallproject.org/2016/07/07/the-horrible-things-i-saw-driving-a-van-packed-with-prisoners (last accessed June 12, 2018) (former USC driver recounting that "we could only stop [the van] at a secure jail or maybe a local police department," and that, even in emergency situations, "[m]y bosses, they would say in so many words, 'You figure it out, we got to make this happen.' They knew we would keep driving. They knew we would make the deadline.").

[8]     A true and correct copy of the transcript of Plaintiff Jeffrey Emil Groover's May 18, 2018 deposition (and all exhibits thereto) is attached as Exhibit "B" to the Hedin Decl.

4

provision of the handbook pertaining to hot weather (stating that "[p]risoners shall not be left in the vehicle for extended periods of time in hot weather," Stirling Depo. Tr., Ex. 6 at 45), as explained at deposition by Mr. Stirling:

> Q: [T]here's a sentence here that states, on page 45, "Prisoners shall not be left in the vehicle for extended periods of time in hot weather." Do you see that?
>
> A: Yes, sir.
>
> Q: What is your understanding of the meaning of the term "extended periods of time"?
>
> A: Extended periods of time would be any great length of time. But on the same note, I'm going to emphasis, if I'm not in a secure location, how can I pull over to let them out? Where can I let them to get cool air?
>
> Q: So as much as you may have wanted sometimes to . . . avoid having inmates be in vehicles for extended period of times in hot weather, you would occasionally not be able to get them out of the hot weather because there's no secure location to stop at; is that correct?
>
> A: Correct.

*Id.* at 86:15-87:11.

Even if drivers could comply with this policy (that "[p]risoners shall not be left in the vehicle for extended periods of time in hot weather"), the Prisoner Transportation Manual fails to define "extended period of time" or "hot weather," rendering the sentence uniformly inadequate for protecting any of the Proposed Class Members. For instance, Mr. Stirling interpreted the phrase "hot weather" as follows:

> Q: And then -- so on -- back to the first sentence on that bullet point, it refers to "hot weather." What was your understanding of what qualified as hot weather within the meaning of these policies and procedures?
>
> A: What hot weather is?
>
> Q: Yeah.
>
> A: How I interpret that is whenever I feel hot. That's how my interpretation of that is.
>
> Q But, as you testified earlier, it's entirely possible that the people in the cages -- in the vans that USC were transporting people in would have been substantially hotter because of the -- just the general way in which they were being transported in the cage; correct?
>
> A: Correct. Correct.

*Id.* 89:17-90:6.  And he interpreted the phrase "extended period of time" as follows:

> Q: What is your understanding of the meaning of the term "extended periods of time"?
>
> A: Extended periods of time would be any great length of time. But on the same note, I'm going to emphasis, if I'm not in a secure location, how can I pull over to let them out? Where can I let them to get cool air?

*Id.* at 86:15-25.

Egregiously, Defendants lack any policy, procedure, or practice whatsoever, in the Prisoner Transportation Manual or otherwise, requiring drivers to provide water to passengers during transport (let alone mandating a minimum amount of water to be provided or the frequency with which it is to be provided), as demonstrated at Mr. Stirling's deposition testimony:

> Q: Could you point me to the location on this document, if any, that outlines the policy of USC for providing water to passengers?
>
> A Give me one second. I'm looking, sir.
>
> Q Thank you. Take your time.
>
> A I don't believe -- I don't see it.
>
> Q Okay. Well, just take your time and go through it just to confirm that they're either in the policy or that maybe there is one. I just want to make sure that you review it thoroughly.
>
> A I don't see it in here, sir.

*See id.* at 77:14-24. Not only is there no policy requiring that water be provided to passengers, the policy against stoppage prohibits drivers from stopping a van in order to obtain water for detainees:

> Q And the policies of the company did not allow you just to stop or whatever at a store and take inmates out or stop and get, you know, fluids for them? It would have to be a secure facility is what you're saying?
>
> A Correct. . . .

*Id.* at 88:6-11.

So uniformly deficient are Defendants' policies and practices that there is not even a requirement for employees to transport pretrial detainees safely or in compliance with federal or state law (but there is such a provision mandating the safe and compliant transport of Defendants' "personnel" and "materials"). *See id.* 80:13-19 (referring to Ex. 6, at 44 (Prisoner Tranportation Manual stating that "[a]ll materials or personnel transported in U.S. Corrections vehicles must be transported safely and in accordance with applicable state and federal laws.")); *id.* at 81:1-4 ("Q: But there's no reference to the actual passengers in that sentence, is there? A: It says all materials – well, no, it does not."); *id.* at 82:7-10 ("Q: [I]s there a provision in this document that requires human beings who are being transported by USC to be transported safely and in accordance with applicable state and federal laws? A: . . . I'm looking through the paperwork, and I don't see anything.").

Defendants' records also detail the uniformly deficient nature of the vehicles and equipment used throughout Defendants' extradition network. All of the transport vans in Defendants' fleet, including the approximately five or ten vans located at U.S. Corrections' Apopka location, *id.* at 19:25-20:3, are nearly identical

6

in build and design. *See, e.g., id.* at 41:8-42:15 ("Q: So what was the make and model of the van that USC used to transport prisoners? A: Usually Ford or Chevy Express vans. Q: Okay. And so of the approximately -- I think you said five to ten vans at the Apopka location -- all those vans were either Chevy or Ford Express vans? A: I believe so. Q: Okay. But, in any event, they were all fairly similar in that they were vans built basically the same way, designed to transport people? A: Yes.").

Further, approximately half of the vans in Defendants' fleet have been modified to include a "dog box" or "dog cage," *id.* at 44:11-12, identical to that in which Plaintiff and all other members of the Proposed Class were transported. *See id.* at 44:13-16, 42:24-43:8. Mr. Stirling described the "dog-cage" modifications as follows:

> Q: Could you just describe the modifications or the way in which USC modified or had another company modify the cargo area of these vans for the purpose of transporting prisoners?
>
> A: They'd actually put a cage that would cover -- and usually a Plexiglass over the window from the -- that would separate the driver and -- the drivers from the cargo area, kind of like on a work van. . . . And then there'd usually be some kind of gate or box inside. They had two different styles. They had one that just went over the windows, the back -- the back door, and the doors on the side. And then there was another one that was an actual dog box – that's called a dog box, which is pretty much a steel cage within it.
>
> Q: Okay. And the dog box is also referred to as the dog cage; correct?
>
> A: Correct.
>
> Q: And so these vans that had the dog cage were set up -- they were set up or modified in the same or substantially the same way?
>
> A: Correct.

*Id.* at 42:17-46:11.

Additionally, each of the vehicles in Defendants' uniformly-modified fleet of "dog cage"-style vans included the same uniformly deficient ventilation system. *See id.* at 46:12-47:15 ("Q: Okay. So all the vans that have the dog cage, the ventilation systems would have been set up the same way; correct? A: Correct. Q: And how many vents were there in the dog cage for air to be pumped in? A: At this time, I don't recall. Q: But it was the same number for all the vans because they were set up the same way; correct? A: Correct."); *see also id.* at 71:6-17 ("Q: Got it. Okay. So if it was hot in the front for you, you knew it was really hot in the back for them. Is that how you . . . you determined when it was not working properly? A: I'd have to put my hand on the AC unit. With any AC unit, you have to -- because I don't have gauges to actually check it or anything, you have to put your hand on it."). Moreover, there was no possibility for natural air flow in any of the "dog cages", because Defendants modified the windows in the passenger areas of all of the vans to be "permanently closed." *Id.* at 51:1-51:25.

As a result of Defendants' uniform failure to implement policies or procedures concerning the provision of water to detainees, or the ability of detainees to seek shelter in cooler areas in hot conditions, coupled with the uniformly deficient nature of Defendants' fleet of vans, modified to contain the same metal "dog cages," inefficient air conditioning and ventilation systems, Plaintiff and the other members of the Proposed Class were all uniformly exposed to excessively hot conditions.  As Mr. Stirling testified at deposition:

> [W]hen you get multiple people together in a small, confined area, especially a metal box [i.e., the dog cage], that even with the amount of AC on full blast right in front of your face, you're not going to be cold. You're not going to be cool. It's going to be hot.

*Id.* at 53:8-53:12; *id.* at 49:24-50:5 ("Q And so during your employment at USC, did any passengers ever complain to you about the heat in the cage or in the cargo area for the van that didn't have a cage while you were transporting them? A Of course. It's summertime in Florida. You can't keep the AC cold enough to keep everyone happy in a metal box."); *id.* at 50:6-50:12 (Q: So based on your experience in the ventilation industry and the air-conditioning business, do you believe that it would have been hotter as a passenger in one of these vans because of the metal box? . . . A: Yes. Anytime you put a metal box within a metal box within a metal box, it's going to produce heat.").

The following exchange says it all:

> Q: What was the most common complaint that you think you got relating to the conditions of the transport from passengers?
>
> A: The heat.
>
> Q: The heat?
>
> A: The heat.

*Id.* at 97:20-98:3.

Each "dog cage"-equipped van was fitted with the same type of GPS tracking system, which Defendants used to record and store detailed maps of the dates, times, and routes (and thereby locations and temperatures) by which each class member was transported.  *See id.* at 57:9-59:17 ("Q: Okay. So does USC have GPS tracking technology on each of its van? A: . . . Actually, I believe they do have GPS on each van, now that I think about it.").  Moreover, Defendants maintained log files and data sheets concerning each passenger and the route that each was transported; these documents, known as "face sheets," "run sheets," and "travel logs," *inter alia*, contain substantially the same fields of information for each passenger and each route. The "face sheets" contain the names and other identifying information for each passenger, *id.* 28:11-18; 30:11-16 (concerning Plaintiff's face sheet), *id.* at 53:22-54:2 (concerning face sheets of the individuals also transported on Plaintiff's "run"), and the "run sheet"

and "travel logs" records contain the route on which a particular group of passengers were transported, the specific vehicle in which each passenger was transported (by VIN number, *see id.*, Ex. 2 at Bates 500088, or the last three digits of the VIN number, *see id.*, Ex. 2 at Bates 500087), and the specific stops made along the way (identified by date, time and location), *id.* 37:19-38:4; *id.*, Ex. 2, at Bates 500087.  Still other records maintained for each passenger by Defendants provide the capacity in which each passenger was transported (such as, in the case of Plaintiff, with a "warrant" classification to indicate that he was being transported in his capacity as a pre-trial detainee).  *See id.* at 31:23-32:21; *id.*, Ex. 2 at Bates 500080 ("Transport Type: Warrant").

Just as a "face sheet," a "run sheet," and the additional record depicted above exist for Plaintiff, the same group of documents, containing the same categories of information, likewise exists for every other passenger transported by Defendants during the class period, including every member of the Proposed Class.  *Id.* at 28:11-18, 30:11-16, 37:19-38:4, 53:22-54:2.  Indeed, in response to Plaintiff's discovery requests in this case, Defendants were able to use the detailed records they maintained for each transportee to generate a list comprised of all individuals transported for 24 or more hours during the months of June through September of years 2014, 2015 and 2016.  *See* Hedin Decl., Ex. C (document produced by Defendant U.S. Corrections, LLC in this litigation and labeled Bates Nos. 501001-501031).

Thus, Defendants' own records – including its records identifying which passengers were transported as pre-trial detainees (reflected on the face sheets and other passenger-specific records, Stirling Depo. Tr., Ex. 2 at Bates 500080), which were transported on vans equipped with "dog cages" (reflected on both the passenger-specific records and run sheets, *id.*, Ex. 2 at Bates 500087-88), and which were transported on vans that stopped at locations (as identified on run sheets, *id.*, Ex. 2 at Bates 500087) where the then-recorded temperature was at or in excess of 80 degrees Fahrenheit (as determined by a judicially-noticeable source, such as the Weather Underground – will be sufficient to identify the size and composition of the Proposed Class and reveal the scale of Defendants' misconduct.[9]

As a direct result of Defendants' uniform policies and practices, at least hundreds of pre-trial detainees have already been subjected to the same deplorable conditions in violation of their fundamental civil rights.  *See*

---

[9]     *See, e.g.,* Hedin Decl., Ex. D (screenshot of Weather Underground website reflecting temperatures of 89.1 degrees Fahrenheit at 3:56 p.m. and 88 degrees Fahrenheit at 4:56 p.m. EST on August 14, 2015 in close proximity of Butner, NC, demonstrating that the outdoor temperature on August 14, 2015 at 4:25 p.m. EST was at least 80 degrees when Plaintiff first entered the van to begin his transport to Fort Lauderdale, FL); *see also* Stirling Depo. Tr., Ex. 2 at Bates 500080 (reflecting Plaintiff "in transit" at "2015-08-14 16:25.17").

Hedin Decl., Ex. C (list of 1,382 individuals transported by U.S. Corrections for over 24 hours during the months of June through September of 2014, 2015, and 2016, at least several hundred of whom were surely transported through a location with a temperature in excess of 80 degrees Fahrenheit). Every day, more and more suffer the same. Plaintiff leads this class action on their behalf, seeking primarily injunctive relief to put an end to these systemically unconstitutional conditions but also damages to redress the severe physical, mental, and emotional harm to Defendants' victims.

## III.   THE PROPOSED CLASS SHOULD BE CERTIFIED

On a motion for class certification, "the question is not whether . . . plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of class certification are met.'" *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178 (1974); *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."). And given the critical role the class action device plays in civil rights enforcement, in cases like this, its requirements must be construed liberally. *See, e.g., Jones v. Diamond,* 519 F.2d 1090, 1099 (5th Cir. 1975) (explaining the "general rule encouraging liberal construction of civil rights class actions").[10] As such, "[c]ourts routinely address conditions of confinement claims in class actions." *Flood v. Dominguez,* 270 F.R.D. 413, 420 (N.D. Ind. 2010) (certifying class of detainees subjected to, *inter alia,* "consistently cold temperatures in cells . . . and small meal portions").[11]

In this case, Plaintiff moves under both Rules 23(b)(2) and 23(b)(3). Thus, in addition to the Rule 23(a) requirements – numerosity, commonality, typicality, adequacy, and the implied requirement of ascertainability – Plaintiff must establish: for Rule 23(b)(2), that Defendants acted or refused to act on grounds generally applicable to the class; and for Rule 23(b)(3), predominance and superiority. *See* Fed. R. Civ. P. 23. As explained below, each requirement is readily satisfied in this case.

---

[10]   "The Eleventh Circuit has adopted as binding decisions of the former Fifth Circuit rendered prior to October 1, 1981." *Gee v. Boyd*, 471 U.S. 1058, 1059 (1985) (citing *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981) (en banc)).

[11]   *See also, e.g., Schilling v. Transcor America, LLC,* 2010 WL 583972 (N.D. Cal. 2010) (certifying similar prisoner transport class); *Mack v. Suffolk County,* 191 F.R.D. 16 (D. Mass. 2000) (certifying class of detainees subjected to strip-search policy); *Thomas v. Baca,* 231 F.R.D. 397 (C.D. Cal. 2005) (certifying class of inmates required to sleep on cell floors); *Dunn v. City of Chicago,* 231 F.R.D. 367 (N.D. Ill. 2005) (certifying class of detainees held in interrogation rooms with irregular access to meals and sanitary facilities).

### A. The Proposed Class Satisfies the Requirements of Rule 23(a)

#### 1. The Proposed Class is Numerous

Rule 23(a)(1) requires that the class be numerous enough that joinder of all members would be impracticable. "Although there is no strict threshold," and plaintiffs "need not show the precise number of members of the class," "classes containing more than 40 members are generally large enough to warrant certification." *Hunter v. Beshear*, 2018 WL 564856, *4 (M.D. Ala. 2018). In prisoner or pre-trial detainee civil right class actions such as this, the numerosity requirement is even "less significant," for "the number of current class members is supplemented by an additional number of future class members." *Id.* For in this "prison-litigation context," the "fluid nature of a plaintiff class . . . counsels in favor of certification of all present and future members." *Id.*

The proposed class here consists of all pre-trial detainees transported by Defendants (and any other subsidiaries of Prisoner Transportation Services) under the same conditions of confinement. Although the exact number has yet to be determined, Defendants discovery responses indicate that there are likely several hundred and potentially thousands of members of the Proposed Class, residing across many states.[12] *See* Hedin Decl., Ex. C (list of 1,382 individuals transported by U.S. Corrections for over 24 hours during the months of June through September of 2014, 2015, and 2016, at least several hundred of whom were surely transported through a location with a temperature in excess of 80 degrees Fahrenheit). Joinder of parties so numerous and widespread is impossible and unworkable.

---

[12] The list of 1,382 names produced by Defendants was generated in response to Plaintiff's request for documents sufficient to identify all people transported for 24 or more hours between the summer months of June through September at any point in the class period. Because Defendants refused to produce all of the face sheets and run sheets for all transportees during the class discovery (although Plaintiff has moved to compel of such discovery), Plaintiff used the number of people transported for 24 or more hours through the months of June through September as a reasonable proxy for the number of pretrial detainees transported for 24 or more hours through at least one location that recorded a temperature outside the van of at least 80 degrees Fahrenheit. *See Taylor v. Screening Reports, Inc.*, 289 F.R.D. 370, 373 (N.D. Ga. 2013) ("A finding of numerosity can be based on reasonable inferences" from the facts); *In re NASDAQ Market-Makers Antitrust Litigation.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996) ("[p]recise quantification of the class members is not necessary because the court may make common sense assumptions to support a finding of numerosity.").

However, Defendants have inexplicably refused to include on their transportee list any individuals transported by Prisoner Transportation Services or any subsidiaries of Prisoner Transportation Services besides U.S. Corrections. Defendants also inexplicably refused to include on their list of transportees any people transported between June and September in year 2017 (or thus far in year 2018), even though the class period extends through the date of the Court's order granting class certification, and even though business was thriving for U.S. Corrections (and Prisoner Transportation Services and its other subsidiaries) during that period of time. Thus, the actual Proposed Class size is likely to be at least twice the number of people who appear on the 2014-2016 list that Defendants have provided thus far.

Accordingly, the class is sufficiently numerous to warrant class treatment pursuant to Rule 23(a).  *See Hunter*, 2018 WL 564856 at *4-*5.

### 2. Proposed Class Members' Claims Share Common Questions

Rule 23(a)(2) requires that the Proposed Class members' claims share common questions of fact and law. This requirement is not demanding; "even a single common question will do." *Hunter*, 2018 WL 564856 at *5. Thus, Plaintiff need only demonstrate that the Proposed Class members' claims depend on at least one "common contention . . . capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)).

The claims of all members of the Proposed Class turn on common facts – namely, the conditions of confinement uniformly imposed pursuant to Defendants' uniform policies and practices.  The claims of all members of the Proposed Class also turn on common questions of law – namely, whether the Proposed Class members' exposure to those common conditions of confinement constituted cruel and unusual punishment.  Such questions can be answered in one stroke for the entire Proposed Class, thus confirming that the claims of the Proposed Class members share common questions of fact and law.  *See, e.g., Lawson v. Wainwright*, 108 F.R.D. 450, 455 (S.D. Fla. 1986) ("A broad based allegation of civil rights violations typically presents common questions of law and fact").[13]

Accordingly, the commonality requirement of Rule 23(a) is satisfied.

### 3. Plaintiff's Claims Are Typical of the Proposed Class

Rule 23(a)(3) requires that the proposed class representative's claims be typical of those of the proposed class.  This also is "a low hurdle." *Hunter,* 2018 WL 564856 at *6 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).  Typicality "does not require identical claims or defense, and minor factual distinctions will not render a class representative's claim atypical." *In re Wells Real Estate Inv. Trust, Inc. Sec. Litig.*, No., 2009 U.S. Dist. LEXIS 131000, at *11 (N.D. Ga. Sept. 16, 2009); *see also Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 769

---

[13]        *See also, e.g., id.* ("Plaintiff challenges a *system-wide* policy of Defendants which is generally applicable to all [class members] housed in the State's correctional system. The questions of law that will resolve the matter are common to all such persons."); *see also Hunter,* 2018 WL 564856 at *5 (that "some class members [may have] experience[d] the constitutional harm in somewhat divergent ways," *e.g.*, "class members [were] detained in various cities and county jails spread [across several states] . . . and therefore experience[d] the harm . . . in different settings," does not defeat commonality).

(11th Cir. 2010) ("Differences in the amount of damages between the class representative and other class members do[ ] not affect typicality."). Rather, to suffice as typical, a class representative's claims need only "'arise from the same event or pattern or practice and [be] based on the same legal theory' as the class claims." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009).

Plaintiff's claims are typical of the claims of all other Proposed Class members. Plaintiff was transported as a pretrial detainee by U.S. Corrections, a subsidiary of Prisoner Transportation Services, for 24 or more hours in a "dog-cage"-equipped van, including through at least one location that had a then-recorded outdoor temperature in excess of 80 degrees Fahrenheit.[14] Plaintiff was exposed to conditions of extreme heat, in violation of his constitutional rights, as a result of Defendants' pervasive and widespread failures to implement policies providing for adequate water or cooler shelter, as well as their widespread and pervasive policies of transporting passengers in "dog-cage"-equipped vans with uniformly deficient air conditioning and ventilation systems, permanently-closed windows, and metal, heat-trapping cargo areas. Just like Plaintiff, all members of the Proposed Class were transported by Defendants under the same deplorable conditions of confinement, pursuant to Defendants' same uniform policies and practices. Like Plaintiff, all Proposed Class members assert that those same, uniformly-imposed conditions of confinement constituted cruel and unusual punishment in violation of the Eight and Fourteenth Amendments to the Constitution. As such, the claims of all Proposed Class members turn upon the very same facts and legal theories, and will be proven by the same evidence, as the claim asserted by Plaintiff.

Accordingly, the typicality requirement of Rule 23(a) is satisfied. *See Hunter*, 2018 WL 564856 at *6.

### 4. Plaintiff and Class Counsel Will Fairly and Adequately Represent the Class

Rule 23(a)(4) requires that the representative of the parties will fairly and adequately protect the interests of the class. This inquiry is two-fold: (1) "the representatives' counsel must be qualified, experienced and generally able to conduct the proposed litigation"; and (2) "the representatives must not possess interests which are antagonistic to the interests of the class." *CV Reit, Inc. v. Levy*, 144 F.R.D. 690, 698 (S.D. Fla. 1992) (citation omitted).

---

[14]    *See, e.g.,* Hedin Decl., Ex. D (screenshot of Weather Underground website reflecting temperatures of 89.1 degrees Fahrenheit at 3:56 p.m. and 88 degrees Fahrenheit at 4:56 p.m. EST on August 14, 2015 in close proximity of Butner, NC, demonstrating that the outdoor temperature on August 14, 2015 at 4:25 p.m. EST was at least 80 degrees when Plaintiff first entered the van to begin his transport to Fort Lauderdale, FL); *see also* Stirling Depo. Tr., Ex. 2 at Bates 500080 (reflecting Plaintiff "in transit" at "2015-08-14 16:25.17").

Plaintiff's counsel at Hedin Hall LLP are well-qualified and experienced class action litigators, and well suited to represent the Proposed Class in this matter.[15]  Frank S. Hedin and David W. Hall have been appointed lead or co-lead counsel in several significant nationwide class actions. Hedin Decl. ¶ 6 (identifying class counsel appointments in nationwide litigations); Declaration of David W. Hall, filed concurrently herewith ("Hall Decl."), ¶ 4 (same).  Courts throughout the country, including in this District, have recognized the extensive experience and superior legal abilities exhibited the attorneys of Hedin Hall LLP in the course of representing aggrieved classes of consumers and investors.  *See, e.g., Chimeno-Buzzi v. Hollister Co.,* 2015 WL 9269266, at *2 (S.D. Fla. 2015) (finding F. Hedin "experienced and adequate counsel" and an "adequate representative[] of the Class," and appointing F. Hedin counsel); *City of Westland Police and Fire Retirement System v. MetLife,* 2017 U.S. Dist. LEXIS 134645, at *18 (S.D.N.Y. 2017) (D. Hall found "adequate and well-qualified for the purpose of litigating class action lawsuits"); *United Food & Commercial Workers Union v. Chesapeake Energy Corp.,* 281 F.R.D. 641, 654 (W.D. Okla. 2012) (same).

Plaintiff Jeffrey Emil Groover is an adequate class representative because his own interests align perfectly with those of the Proposed Class he seeks to represent. As discussed throughout, Plaintiff asserts the very same civil rights claims that all absent Proposed Class members assert.  Plaintiff has already shown the initiative, commitment, and prudence required to prosecute and protect the interests of Proposed Class.  He initiated this action *pro se* against Defendants three years ago, weathered early dismissal by winning a *pro se* appeal before the U.S. Court of Appeals for the Eleventh Circuit, retained competent, experienced counsel to prosecute this case on behalf of himself and the Proposed Class, and has indeed vigorously prosecuted this case on behalf of the Proposed Class for the last eight months.

When Plaintiff sat for deposition in this matter on May 18, 2018, he answered every question he was asked, concerning every aspect of this case and his life, including about his adequacy to serve as class representative.  In responding to a question from Defendant's counsel asking "why" he filed this nationwide class action against her client, Plaintiff demonstrated that he has the sort of passion and determination for this case that renders him not just adequate but the *ideal* representative to serve on behalf of the Proposed Class. *See* Groover Depo. Tr. at 113:2-9 ("Q: But you chose to file a federal lawsuit on it. Why?  A: Yes. I want to put a stop to this. I want to put a stop

---

[15]      As a result of the 2003 amendments to the Federal Rules of Civil Procedure, the appointment of class counsel is now guided by Rule 23(g).  The ultimate requirement remains unchanged: that class counsel fairly and adequately represent the interests of the class.  That requirement in met here.

to these people. . . . And their draconian, barbaric methods of transporting people. I want to put these people out of business and hope that they rot in hell for the way that they treated people.").

Throughout this case, Plaintiff has shown a willingness and ability to take an active role in, and control of, this litigation to protect the interests of the Proposed Class. Plaintiff has demonstrated that he: (i) understands the requirements and responsibilities of serving as a class representative in a civil rights class action; (ii) has reviewed the key pleadings in this action; (iii) has thus far and intends to continue supervising and monitoring the progress of this litigation; (iv) intends to work with proposed class counsel to end Defendants' misconduct and redress the harm to the class; and (v) is willing and able to provide testimony at deposition and trial, if necessary.[16]

Plaintiff's complete alignment with and demonstrated commitment and ability to represent the Proposed Class, coupled with his counsel's extensive experience in similar cases, more than satisfy the adequacy of representation requirement pursuant to Rule 23(a).

### 5. The Proposed Class is Ascertainable

In addition to the express requirements of Rule 23(a), the Eleventh Circuit has recognized an implicit threshold requirement that a proposed class be "adequately ascertainable." *See Bussey v. Macon County Greyhound Park, Inc.*, 562 Fed. Appx. 782, 787 (11th Cir. 2014). "Ascertainability has traditionally been defined as the existence of a class whose members can be identified by reference to objective criteria in the class definition." *Karhu v. Vital Pharmaceuticals, Inc.* 621 Fed. Appx. 945, 952 (11th Cir. 2015). A "'court need not know the identity of each class member before certification; ascertainability requires only that the court be able to identify class members at some stage of the proceeding.'" *Id.* (quoting Newberg on Class Actions § 3.3 (5th ed.)).

The Proposed Class is defined by objective criteria – date of transport, duration of transport, means of transport, pretrial detainee status at time of transport, recorded outdoor temperature during transport, and entity performing the transport – all of which is verifiable though reference to Defendants's records, juridically-noticeable

---

[16]    Plaintiff was recently transferred from his correctional facility in Butner, NC to a new facility in Miami, FL. As a result of the logistics associated with his transfer, *inter alia*, Plaintiff has been unable to adequately communicate with his counsel for over a week, much less meet with his counsel to prepare and sign a declaration. Plaintiff has now arrived at his new facility, and undersigned counsel is now coordinating with prison officials to schedule a time for him to meet with his client to discuss this case, including to obtain a declaration from Plaintiff concerning his role as class representative. Thus, in the coming days, Plaintiff will supplement this Motion with an affidavit further attesting to his understanding of the requirements and responsibilities of serving as class representative on behalf of the Proposed Class, and to reiterate his commitment to protecting and safeguarding the interests of the Proposed Class going forward.

sources, and, to the extent necessary, third-party records (such as the records of the state and local agencies who retained Defendants' transportation services).

Accordingly, the Proposed Class is ascertainable.  *See, e.g., Legg v. Spirit Airlines*, 315 F.R.D. 383, 388 (S.D. Fla. 2015) (class ascertainable by reference to Defendants' records).

### B.  The Proposed Class Satisfies the Requirements of Rule 23(b)(2)

This civil rights class action is ideally suited for certification under Rule 23(b)(2).  *See Wal-Mart Stores, Inc.*, 564 U.S. at 2557 (explaining that "'[c]ivil rights cases . . . are prime examples' of what (b)(2) is meant to capture.") (quoting *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 614 (1997)).  "Rule 23(b)(2) can be distilled to two basic requirements: (1) the opposing party's conduct or refusal to act must be 'generally applicable' to the class; and (2) final injunctive or corresponding declaratory relief must be requested for the class."  *Anderson v. Garner*, 22 F.Supp.2d 1379, 1386 (N.D. Ga. 1997). Both are met here.

Regarding the first requirement, "[t]he term 'generally applicable' does not require that the party opposing the class act directly against each member of the class." *Id.*  "The key is whether his actions would affect all persons similarly situated so that his acts apply generally to the whole class. Thus, all the class members need not be aggrieved by or desire to challenge the defendant's conduct in order for one or more of them to seek relief under Rule 23(b)(2)."  *Id.*  "What is necessary is that the challenged conduct or lack of conduct be premised on a ground that is applicable to the entire class."  *Id.* (internal citations omitted).  Courts routinely find this first requirement satisfied in prisoner civil rights actions such as the instant matter, where class members are incarcerated or otherwise subjected to conditions of confinement pursuant to a defendant's uniform policies and practices.  *See id.* (collecting cases); *see also Hunter*, 2018 WL 564856, at *7 (where prisoners "complain [of] *systemic* failure" and "seek transformation of that system," "certification pursuant to subpart (b)(2) is appropriate"); *Baca*, 231 F.R.D. at 403 (uniform jail policy shows "defendants [] acted on grounds general applicable to the class," and thus certifying "injunction class action under Rule 23(b)(2)").

As to the second Rule 23(b)(2) requirement, Plaintiff expressly seeks injunctive relief to redress Defendants' systemic constitutional violations.  *See, e.g.*, First Amended Complaint (ECF No. 36) at 27-28.  "The fact that Plaintiffs also seek compensatory and punitive damages does not eliminate their eligibility to seek class certification pursuant to Rule 23(b)(2); certification under Rule 23(b)(2) is inappropriate only if the claims for money damages predominate over the claims for injunctive relief." *Anderson*, 22 F. Supp. 2d at 1386.; *see also Collins v. International Dairy Queen, Inc.,* 168 F.R.D. 668, 675 (M.D. Ga. 1996).  In this case, injunctive relief is the

predominate relief sought. Plaintiff and much of the Proposed Class remain incarcerated. Every day presents the real threat of being transported again, to another facility or court for another hearing, under similarly deplorable conditions by Defendants. Plaintiff and the Proposed Class have absolutely no control over when, how or by whom they are transported. Those decisions are solely within the purview of agencies who have already decided to use Defendants' transport network in the past. The threat of future harm is thus real and imminent, and it hangs over Plaintiff and the Proposed Class every single day of incarceration.

Accordingly, the Proposed Class is appropriate for certification under Rule 23(b)(2).

### C. The Proposed Class Satisfies the Requirements of Rule 23(b)(3)

The Proposed Class also qualifies for certification under Rule 23(b)(3) because: (1) common question predominate; and (2) a class action is superior to any alternative.

#### 1. Common Questions Predominate

Rule 23(b)(3) requires that common questions predominate over individualized questions. This "does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen*, 568 U.S. at 469. Nor that common "questions will be answered, on the merits, in favor of the class." *Id.* at 459. "What the rule does require is that common questions *predominate* over any questions affecting only individual class members." *Id.* at 469. Common questions predominate if "common liability issues . . . may be resolved efficiently on a class-wide basis." *Brown v. SCI Funeral Services of Florida, Inc.*, 212 F.R.D. 602, 606 (S.D. Fla. 2003).

In this case, Defendants' liability is premised on violations of 42 U.S.C. § 1983. A claim under § 1983 has "two essential elements. First, the conduct complained of must have been committed by a person acting under color of state law. Second, the plaintiff must allege that this conduct deprived him of his rights, privileges, and immunities secured by the Constitution or the laws of the United States." *Quinoes v. Durkis*, 638 F. Supp. 856, 859 (S.D. Fla. 1986) (citing *Parratt v. Taylor,* 451 U.S. 527 (1981)).

The first § 1983 element requires resolution of questions that are *per se* common in this case, because the questions concern (1) Defendants' own relationship to the government, *i.e.*, whether Defendants acted as a functional equivalent of a municipality "under color of state law," and (2) the pervasiveness and wide-spread nature of Defendants' conduct, *i.e.*, whether Defendants "had a custom or policy that constituted deliberate indifference to [the] constitutional right[s]" of the Proposed Class members. *See McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). These questions are capable of class-wide resolution regardless of any fact unique to a particular

Proposed Class member because the Proposed Class is comprised entirely of pretrial detainees who, by definition, were subjected to the same customs and policies by Defendants.

The second § 1983 element likewise turns almost entirely on common issues of law and fact. Determining whether the policies and practices in this case constituted cruel and unusual punishment is an issue susceptible to resolution in one stroke class-wide, by asking the same questions of law and fact concerning the same conditions of confinement uniformly experienced by each Proposed Class member. *See Groover*, 15-14813, Apr. 4, 2017, Op. at 7-8 (citing *Chandler v. Crosby*, 379 F.3d 1278, 1289, 1297-98 (11th Cir. 2004)) (explaining that, to demonstrate that conditions of confinement violate the Constitution, the detainee must show that the challenged condition is "extreme," meaning it "pose[s] an unreasonable risk of serious damage to his future health or safety," an analysis which, in the context of hot conditions, courts "look to factors such as whether: at the hottest times of day it was cooler inside than outside; there was a ventilation system that effectively managed air circulation and humidity; or there were other conditions that alleviated rather than exacerbated the heat, including the availability of running water and the opportunity to enter air conditioned areas").

Thus, myriad common questions of fact and law underlie the § 1983 claims of all Proposed Class members in this case, including:

(1) Whether Defendants' performed a function traditionally within the exclusive prerogative of states by transporting the Proposed Class members;

(2) whether Defendants engaged and/or still engages in the transportation of passengers pursuant to the same or substantially the same policies, customs, or practices;

(3) whether Defendants had and/or still have a persistent and wide-spread practice of transporting passengers for more than 24 hours at a time through locations with outdoor temperatures of at or in excess of 80 degrees Fahrenheit;

(4) whether Defendants had and/or still have a persistent and wide-spread practice of transporting passengers for more than 24 hours in such temperatures in "dog cages"-equipped vans that have the same or substantially similar type, build and modifications in terms of the cargo area in which passengers are located during transportation;

(5) whether Defendants had and/or still have a persistent and wide-spread practice of depriving passengers sufficient water during transportation, or uniformly lacked any necessary policy, custom, or practice regarding the provision of water to passengers during transportation, including the amount of water and frequency of providing water to passengers;

(6) whether Defendants had and/or still have a persistent and wide-spread practice of depriving passengers the ability to take shelter in cooler areas during times of extreme heat during transportation, or uniformly lacked any necessary policy, custom, or practice regarding the measures to take in situations in which passengers are exposed to extreme heat during transportation; and

(7) whether Defendants had and/or still have a persistent and wide-spread practice of transporting passengers in "dog cage"-equipped vans equipped with ineffective or deficient air conditioning and ventilation equipment;

18

(8) whether the Proposed Class members were transported pursuant to the foregoing persistent and wide-spread practices of Defendants;

(9) whether, at the times of day when the outdoor heat reached or exceeded 80 degrees Fahrenheit during the transportation of the Proposed Class members, it was hotter inside the "dog-cage"-equipped vans than outside the dog-cage"-equipped vans;

(10) whether the air conditioning and air ventilation systems installed in the "dog-cage"-equipped vans used to transport the Proposed Class members effectively managed air circulation or humidity inside the vans;

(11) whether the Proposed Class members, during their transportation in the "dog-cage"-equipped vans, had sufficient access, if any access at all, to running water;

(12) whether the Proposed Class members, during their transportation in the "dog-cage"-equipped vans, had sufficient opportunity, if any opportunity at all,  to enter air conditioned areas;

(13) whether Defendants' transportation of the Proposed Class members exposed the Proposed Class members to extreme heat without adequate cooling or ventilation, posing unreasonable risk of serious damage to their future health or safety;

(14) whether Defendants violated the constitutional rights of the Proposed Class members by transporting them in the "dog-cage"-equipped vans for more than 24 hours at a time through locations that had outdoor temperatures of at least 80 degrees Fahrenheit;

(15) whether transporting the Proposed Class members in the "dog-cage"-equipped vans for more than 24 hours at a time through locations that had outdoor temperatures of at least 80 degrees Fahrenheit constituted deliberate indifference to the Proposed Class members' constitutional rights under the Eighth and Fourteenth Amendments;

(16) Whether Defendants' transportation of the Proposed Class members in the "dog-cage"-equipped vans for more than 24 hours at a time through locations that had outdoor temperatures of at least 80 degrees Fahrenheit caused the constitutional violations suffered by the Proposed Class members;

Each of the foregoing questions concerns the pervasiveness of Defendants' customs and practices, whether such customs and practices resulted in conditions that violated the constitutional rights of all Proposed Class members, and whether Defendants are liable for the constitutional rights violations resulting from such customs and practices.  Accordingly, each of the foregoing factual and legal questions is capable of resolution with common proof and law. *See Amgen*, 568 U.S. at 459.  And because all of the questions central to Defendants' liability are capable of class-wide resolution, common issues predominate.  *See, e.g., Schilling*, 2010 WL 583972, at *9-*11 (certifying Rule 23(b)(3) class of prisoners challenging conditions of confinement during transport, holding that "variations in inmates' experiences during their transports should not defeat certification because the predominant issue in this case is whether defendants' policy . . . violates the inmates' constitutional rights.").[17]

---

[17]        *See also, e.g., Tyler v. Suffolk County*, 253 F.R.D. 8, 11 (D. Mass 2008) (holding "core issues" of Defendant's policy or practice and whether it violated inmates' civil rights predominate over any individualized questions of how the policy "affected different inmates differently"); *Baca*, 231 F.R.D. at 402-403 (holding predominance satisfied where "[t]he central issue to a claim brought by any potential class member is whether [the conditions of confinement] permit[] him to recover under § 1983. All the class members share this legal question. They also share the fact that they have been

Because common questions predominate over any questions affecting individual members of the Proposed Class, the predominance requirement of Rule 23(b)(3) is satisfied in this case.

### 2.   A Class Action is Superior to Any Alternative

Finally, Rule 23(b)(3) also requires consideration of whether a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy.

A class action here is not only superior to individual actions, it is the only sensible course.  *See, e.g., Dunn*, 231 F.R.D. at 378 ("Requiring each class member to bring a separate action would be a waste of time and money.  In addition, it is likely that many individual members would forfeit their claims if they could not pursue them as a class because of the expense and complexity of litigating" such claims).  The Proposed Class consists of hundreds (if not thousands) of geographically-dispersed individuals, many of whom are indigent or incarcerated and thus lack the financial means or legal skills necessary to effectively prosecute these claims.  Thus, for nearly every member of the Proposed Class, the alternative to a class action would be no action at all, and Defendants' unconstitutional conduct would continue unabated.  Meanwhile, members of the Proposed Class would lose their legal rights by attrition.  *See Baca*, 231 F.R.D. at 402-403 (explaining that in prisoner civil rights cases, "the injuries and claims are virtually identical," yet "the potential recovery for any one member's action would be low relative to the cost of prosecuting the action, such that it would discourage bringing the claim").

A multiplicity of individual suits throughout the country (the only possible alternative to this proposed class action) would be a much less efficient means of administering justice and would also risk conflicting decisions – precisely the sorts of "evil[s] that [class actions were] designed to prevent."  *Califano v. Yamasaki*, 442 U.S. 682, 690 (1979).  Far worse, a denial of class certification could leave hundreds and maybe thousands of aggrieved citizens entirely without recourse; for example, failure to file individual suit while relying on this case could potentially render claims barred by applicable statutes of limitation and repose.  *See, e.g., Berkley v. United States*, 45 Fed. Cl. 224, 234 (1999) ("[A]n expiring statute of limitations is a 'legitimate concern'").  Finally, concentration of the claims of the Proposed Class would serve the interests of judicial economy, because this Court and the Eleventh Circuit have both already ruled on substantive motions and thus are already familiar with the facts and law.  *See Public Emples. Ret. Sys. Miss. v. Goldman Sachs Group, Inc.*, 280 F.R.D. 130, 141 (S.D.N.Y. 2012).

Accordingly, certification of the Proposed Class satisfies the superiority requirement of Rule 23(b)(3).

---

allegedly [subjected to those conditions of confinement]," thus any remaining "individualized questions of law and fact are peripheral.").

## IV.    CONCLUSION

For the foregoing reasons, the Court should certify the Proposed Class pursuant to Rules 23(b)(2) and 23(b)(3).

DATED:  June 18, 2018                    Respectfully submitted,

HEDIN HALL LLP

By: /s/ Frank S. Hedin
        Frank S. Hedin

FRANK S. HEDIN (FBN 109698)
DAVID W. HALL*
1395 Brickell Ave, Suite 900
Miami, Florida 33131
Telephone:      (305) 357-2107
Facsimile:      (305) 200-8801
E-mail: fhedin@hedinhall.com
E-mail: dhall@hedinhall.com

*Pro Hac Vice Application Forthcoming

**CERTIFICATE OF SERVICE**

I hereby certify that on June 18, 2018, a true and correct copy of the foregoing was served via the Court's CM/ECF filing system on counsel of record in this action.

/s/ Frank S. Hedin
Frank S. Hedin